# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **S.L.** | |
| *Plaintiff*, | |
| | |
| **v.** | Civil Action No. |
| | |
| **UNITED STATES OF AMERICA,** | |
| SERVE: | |
| Federal Tort Claims Act Section | |
| Tort Branch, Civil Division | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| U.S. Attorney's Office | |
| 210 Park Avenue, Suite 400 | |
| Oklahoma City, Oklahoma 73102 | |
| | |
| U.S. Attorney General Bondi | |
| U.S. Department of Justice | |
| 950 Pennsylvania Ave. NW | |
| Washington, DC 20530-0001 | |
| | |
| *Defendant*. | |

## COMPLAINT

### INTRODUCTION

1.      Correction Officer D. Banks (Banks) used his position as a correctional officer at Federal Transfer Center Oklahoma City (FTC Oklahoma) to sexually abuse and harass prisoners under his control, including Plaintiff S.L.[1] She then experienced intolerable retaliation at the Federal Correctional Institution Dublin (FCI Dublin).

---

[1] Plaintiff is concurrently filing a motion to proceed under a pseudonym for fear of retaliation.

1

2.      Despite reports across the Bureau of Prisons and at FTC Oklahoma, and FCI Dublin, Bureau of Prisons (BOP) leadership continued allowing sexual predators, like Banks, unfettered access to sexually abuse vulnerable women in their custody and control.

3.      BOP leadership had actual and constructive knowledge of rampant sexual abuse across the BOP and failed to implement any systems congruent with policy to protect those in its care.

4.      As a direct result of these failures, Plaintiff S.L. was sexually assaulted and later retaliated against for reporting the abuse.

5.      Plaintiff S.L. suffers from ongoing trauma because of sexual violence, mental torment, and retaliation she suffered, including symptoms such as fear, lack of trust, insomnia, chronic nightmares, anxiety, flashbacks, depression, and Post-Traumatic Stress Disorder.

6.      Plaintiff brings this suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, *et seq*., in connection with the deficient supervision and custodial care provided to her by various personnel, including Banks, within the scope of their employment with the BOP.

7.      Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer permanent and catastrophic injuries, and which could have and should have been prevented.

## JURISDICTION AND VENUE

8.      This action involves claims arising under United States, Oklahoma, and California state laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4).

9.      Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district.

**PARTIES**

10.     Plaintiff S.L. (Plaintiff) was, at all times relevant herein, incarcerated in BOP facilities, including FTC Oklahoma City, located at 7410 S. MacArthur Blvd., Oklahoma City, Oklahoma, 73169, Federal Correctional Institution (FCI) Dublin, formerly located at 5701 8th Street, Dublin, California, 94568, and FCI Aliceville, located at 11070 AL-14, Aliceville, Alabama, 35442. She is a member of the class certified in *California Coalition for Women Prisoners v. United States of America Federal Bureau of Prisons et al.*, No. 4:23-CV-04155-YGR.

11.     Plaintiff is currently incarcerated at FCI Waseca, located at 1000 University Dr, SW Waseca, Minnesota, 56093.

12.     The Defendant United States of America ("United States") is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiff's claims under the FTCA. The United States is a sovereign entity that has waived immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

13.     The BOP is a component of Defendant United States' Department of Justice (DOJ).

14.     The BOP operates and is in possession and control of FTC Oklahoma. FTC Oklahoma is a correctional institution that houses male and female offenders and parole violators who have yet to be assigned to a permanent prison facility.

15.     The BOP operated and was in possession and control of FCI Dublin. FCI Dublin was a correctional institution that housed female offenders and parole violators until it was closed on or around December 2024.

16.     At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct

of all BOP matters, including at FTC Oklahoma and FCI Dublin, and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including, but not limited to, Officer Banks.

17.    While acting and failing to act as alleged herein, Defendant had complete custody and total control of Plaintiff.

18.    Plaintiff was dependent upon Defendant for her personal security and necessities.

19.    In performing the acts and omissions contained herein, Defendant, and each of its employees, acted under color of federal law, and each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff.

20.    Defendant knew or should have known that its conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiff and to her constitutionally, statutorily, and common law protected rights. Despite this knowledge, Defendant failed to take steps to protect Plaintiff and to ensure her rights to safety from sexual assault.

21.    Defendant is liable for the tortious acts of its employees.

22.    At all times relevant hereto, the Defendant, as well as Banks, was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent.

### DEFENDANT KNEW OF AND FAILED TO PROPERLY ADDRESS SEXUAL VIOLENCE RAMPANT ACROSS THE BOP

23.    Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

4

24.    In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*."[2]

25.    That Amnesty Report detailed:

Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[3]

26.    The Amnesty Report was widely circulated and read by responsible corrections professionals.

27.    Yet sexual violence continued to plague the BOP with little to no systemic response intended to curtail the abuse.

28.    Between 2012 and 2022, BOP opened 5,415 cases of sexual abuse by BOP employees, of which 586 were substantiated.[4]

29.    The true number of sexual assaults that occurred over this period is likely far worse than records indicate because many prisoners do not report sexual assaults for fear of retaliation.

30.    An investigation by the Associated Press published in 2021 documented that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they did not comply with sexual abuse. [5]

---

[2] "*Not Part of My Sentence: Violations of the Human Rights of Women in Custody*, AMNESTY INT'L (March 26, 2011), https://www.amnestyusa.org/reports/usa-not-part-of-my-sentence-violations-of-the-human-rights-of-women-in-custody/.

[3] *Id.*

[4] STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., REPORT ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS 18 (Comm. Print. 2022).

[5] Michael Balsamo & Michael R. Sisak, *Inside Federal Prisons, Employees are Committing the Crimes*, TORONTO CITY NEWS (Nov. 14, 2021), https://toronto.citynews.ca/2021/11/14/inside-federal-prisons-employees-are-committing-the-crimes/.

31.     The AP reporting also uncovered DOJ's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[6]

### DOJ Working Group

32.     In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by BOP employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct and looking at the "hundreds of [incidents of] sexual abuse perpetrated by its employees over the past five years."[7]

33.     The working group noted long-standing, pervasive problems throughout the BOP, including insufficient reporting mechanisms, "flawed investigations," and instances of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[8]

34.     Additionally, it determined that changes to the "culture and environment in BOP facilities" were needed to address the rampant sexual violence.[9]

35.     The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."[10]

---

[6] *Id.*

[7] *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, PRINCIPAL ASSOC. DEPUTY ATT'Y GEN. WORKING GRP. OF DEP'T OF JUST. COMPONENTS (Nov. 2, 2022), https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf

[8] *Id.*

[9] *Id.*

[10] *Id.*

36.     The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."[11]

37.     Significantly, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."[12]

38.     This practice was a problem because "[t]here is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements runs counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."[13]

39.     Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[14]

40.     The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[15]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

[15] *Id.*

41.     The implication of this guidance, given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

42.     Additionally, the working group recommended that the BOP develop an "early warning system" to detect signs that staff may be engaged in sexual conduct and to identify staff with a history of abuse.[16]

43.     This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit or from facility to facility without any systemic tracking or identification.

44.     Despite the working group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, Banks was able to sexually assault Plaintiff.

### Memorandum from Office of the Inspector General

45.     In October 2022, the DOJ Office of the Inspector General (OIG) issued a Management Advisory Memorandum detailing its concerns over how the BOP had been handling administrative misconduct investigations and prisoner statements relevant to those investigations.[17]

46.     The OIG specifically noted that "[t]he BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct

---

[16] *Id.*

[17] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees,* U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Oct. 2022), https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates."[18]

47.     The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences."[19]

48.     The report explained that the "OIG has serious concerns that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff-on-inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees."[20]

49.     In sum: "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[21]

### Criminal Prosecutions

50.     Over the last four years, more evidence of sexual abuse in the BOP has surfaced.

51.     In 2022, a jury convicted a former FCI Dublin warden of sexually abusing three prisoners from 2019 through 2021 and making false statements to federal agents. Separate from

---

[18] *Id.* at 3.

[19] *Id.* at 4.

[20] *Id.* at 9.

[21] *Id.*

the warden's own sexually abusive behavior, eight FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[22]

52.    In February 2022, a former FCI Dublin chaplain pleaded guilty to five felony charges related to the repeated sexual abuse of an inmate from 2018 to 2019 and lying to federal agents.[23]

53.    In April 2022, a former corrections officer and drug treatment specialist at the Federal Medical Center in Lexington, Kentucky (FMC Lexington) pleaded guilty to sexually abusing four prisoners – all participants in his drug treatment classes – between August and December 2019.[24]

54.    In June 2023, a jury convicted a former FCI Dublin corrections officer of sexually abusing two prisoners from 2019 to 2020.[25]

55.    In September 2023, a former FMC Lexington corrections officer pleaded guilty to sexually abusing an inmate on more than one occasion in September 2022.[26]

---

[22] Lisa Fernandez, *8 Correctional Officers Now Charged with Sex Abuse at FCI Dublin; 7 Found Guilty*, Fox KTVU (July 17, 2023), https://www.ktvu.com/news/8-correctional-officers-now-charged-with-sex-abuse-at-fci-dublin-7-found-guilty.

[23] *Press Release, Federal Prison Chaplain Sentenced for Sexual Assault and Lying to Federal Agents,* U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Aug. 31, 2022), https://www.justice.gov/archives/opa/pr/federal-prison-chaplain-sentenced-sexual-assault-and-lying-federal-agents.

[24] *Press Release, Former BOP Employee Sentenced to 80 Months in Prison for Sexual Abuse of a Ward*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (July 29, 2022), https://www.justice.gov/archives/opa/pr/former-bop-employee-sentenced-80-months-prison-sexual-abuse-ward.

[25] *Press Release, Jury Convicts Federal Correctional Officer for Sexual Abuse of Two Female Inmates,* U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (June 6, 2023)**,** https://www.justice.gov/archives/opa/pr/jury-convicts-federal-correctional-officer-sexual-abuse-two-female-inmates.

[26] *Press Release, Former Federal Correctional Officer Pleads Guilty to Sexual Abuse of a Ward*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Sep. 25, 2023), https://www.justice.gov/archives/opa/pr/former-federal-correctional-officer-pleads-guilty-sexual-abuse-ward.

56.      Also in September 2023, a former FCI Dublin corrections officer pleaded guilty to four counts of sexual abuse of a ward and five counts of abusive sexual contact, involving seven victims.[27]

57.      In December 2023, a former BOP Pharmacy Technician at FCI Petersburg pleaded guilty to sexually abusing a prisoner between November 2021 and June 2022. The abuse primarily occurred on weekends, when the technician would be alone with the victim in the medical unit.[28]

58.      In January 2024, a former FCI Aliceville corrections officer pleaded guilty to sexually abusing two prisoners in 2018 and 2019.[29]

59.      In August 2025, a former FCI Dublin corrections officer and paramedic employed between July 2021 and September 2022 pleaded guilty to repeatedly sexually abusing a prisoner.[30]

60.      Also in August 2025, a former FCI Dublin corrections officer pleaded guilty to abusive sexual contact with a prisoner between March and June 2022.[31]

---

[27] *Press Release, Seventh Correctional Officer at Federal Facility in Dublin, California, Sentenced to Prison for Sexual Abuse of Female Prisoners*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (March 27, 2024), https://www.justice.gov/archives/opa/pr/seventh-correctional-officer-federal-facility-dublin-california-sentenced-prison-sexual.

[28] *Former BOP Pharmacy Technician Pleaded Guilty to Sexual Abuse*, U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Dec. 19, 2023), https://oig.justice.gov/news/press-release/former-bop-pharmacy-technician-pleaded-guilty-sexual-abuse-ward.

[29] *Press Release, Former Federal Bureau of Prisons Corrections Officer Sentenced for Sexually Abusing Inmate in His Custody*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (May 23, 2024), https://www.justice.gov/usao-ndal/pr/former-federal-bureau-prisons-corrections-officer-sentenced-sexually-abusing-inmate.

[30] *Press Release, Two More FCI Dublin Correctional Officers Plead Guilty to Sexually Abusing Female Inmates*, U.S. DEP'T OF JUST., OFFICE OF PUB. AFF. (Aug. 7, 2025), https://www.justice.gov/usao-ndca/pr/two-more-fci-dublin-correctional-officers-plead-guilty-sexually-abusing-female-inmates.

[31] *Id.*

61.     In December 2025, a former corrections officer at the Federal Correctional Complex in Oakdale, Louisiana was sentenced following his guilty plea to abusive sexual contact with a prisoner in June 2024.[32]

**United States Senate Subcommittee**

62.     In 2022, the United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs (the Subcommittee) found that the BOP's Office of Internal Affairs had, at the time of publication, a backlog of 8,000 allegations of employee misconduct, some pending for over five years.[33]

63.     Although the law requires it, the BOP did not systematically use the data it had to analyze and prevent sexual abuse of wards.[34]

64.     The Subcommittee noted that "save for an ad hoc review, the BOP does not ascertain whether the number of sexual abuse allegations at a specific facility or region is trending or part of a larger pattern."[35]

65.     Though the Prison Rape Elimination Act (PREA) standards require the BOP to "collect accurate, uniform data for every allegation of sexual abuse" and "review the data collected to identify problem areas and take corrective action on an ongoing basis," BOP officials admitted they do not analyze complaint data to identify employees who are repeatedly alleged to abuse prisoners, facilities with an outlier number of complaints, or broader system-wide issues."[36]

---

[32] *Former BOP Correctional Officer Sentenced for Abusive Sexual Contact*, U.S. DEP'T OF JUST., OFFICE OF THE INSPECTOR GEN. (Dec. 4, 2025), https://oig.justice.gov/news/press-release/former-bop-correctional-officer-sentenced-abusive-sexual-contact-1.

[33] STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 117TH CONG., *supra* note 4 at 4.

[34] *Id.* at 22-23.

[35] *Id*. at 23.

[36] *Id*. at pp. 22-23 (quotations cleaned up).

**FCI Dublin Class Action**

66.    In 2024, the court in the FCI Dublin Class Action found that "the Bureau of Prisons has proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years."[37]

67.    In deciding to appoint a Special Master, the Northern District of California determined that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[38]

68.    The Court made that determination because of the delays in action by the BOP Central Office, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[39]

69.    In 2024, a Special Master Report unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI Dublin."[40]

70.    The report's findings detailed the failures of the BOP, including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been identified [sic] in multiple audits and investigations."[41]

---

[37] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 719 (N.D. Cal. 2024) (cleaned up).

[38] *Id.* at 736.

[39] *Id.* at 737.

[40] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[41] *Id.* at 13.

71.     The Special Master also found that "management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[42]

72.     The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[43]

73.     The Special Master also reported that the BOP had "no standard protocol to report violations."[44]

74.     The Special Master also noted that the BOP-wide data showed less than a 2% acknowledgement rate for Administrative Remedies, which was "difficult to justify."[45]

75.     The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault."[46]

76.     Further, in a May 2025 report focusing on FMC Carswell, the Special Master found that, at that specific facility, "staff, in general, have difficulty comprehending what constitutes a sexual abuse or PREA complaint."[47]

77.     Specific examples included five Dublin class members at FMC Carswell who reported they had tried many times to file PREA complaints, and a woman who was observed by male and female officers while she underwent a vaginal hysterectomy. The original investigating

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at 29.

[45] *Id.* at 10, 70.

[46] *Id.* at 29.

[47] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 2nd Public Monthly Status Report May 1 - 31, 2025, 55, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-May-2025-Monthly-Consent-Decree-Report-FINAL-July-29-2025.pdf at 55.

officer found no action was warranted, even though policy dictates that it should have been referred to the Office of Internal Affairs.[48]

78.    The Report also found that: "Additionally, there appears to be a basic misunderstanding regarding the role of the PREA Compliance Manager and staff at FMC Carswell regarding the requirement that a sexual abuse complaint be logged, documented, and forwarded to the investigative level."[49]

79.    In another required report, the Special Master found that PREA Compliance Monitors (PCMs) at each BOP facility, "appear to lack the full scope of training and knowledge the Orientation Guide mentions. These deficiencies appear to contribute to the lack of a safe environment for Class Members at these facilities. Furthermore, PCMs assume this role on a rotation basis, with little training provided by BOP."[50]

### Government Accountability Office

80.    On September 29, 2025, the United States Government Accountability Office (GAO) released a report titled "Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct."[51]

---

[48] *Id.* at 56.

[49] *Id.*

[50] Wendy Still, MAS, Senior Monitor California Coalition for Women Prisoners, et al., v. U.S. Federal Bureau of Prisons, et al., Consent Decree Case No. 4:23-cv-04155-YGR, 1st Quarterly Status Report, March 31 – June 30, 2025, 22, https://rbgg.com/wp-content/uploads/FCI-Dublin-Case-4-23-cv-04155-YGR-1st-Quarterly-Report-March-31-June-30-2025-FINAL.pdf at 22.

[51] U.S. Government Accountability Office, Report to Congressional Requesters, *Bureau of Prisons: Strategic Approach Needed to Prevent and Address Employee Misconduct*, September 2025, https://www.gao.gov/assets/gao-25-107339.pdf.

81.     The GAO found that, between October 2013 and February 2025, the BOP Office of Internal Affairs opened 86,193 cases and complaints of employee misconduct.[52]

82.     While that number includes all employee misconduct allegations, BOP investigated more sexual abuse allegations than any other category, except for the introduction of contraband.[53]

83.     Further, the fourth-most investigated category was inappropriate relationships, which "could involve [BOP] employees engaging in inappropriate sexual relationships with subordinates or showing partiality toward incarcerated individuals."[54]

84.     In short, the long history of the Defendant's mismanagement created the conditions that led directly to Plaintiff being raped and sexually abused by a BOP staff member under his care, and who, had Defendant systematically monitored, as they should have according to their responsibilities, would have been terminated or otherwise removed from his position of power.

85.     This mismanagement existed in the face of binding regulations requiring the contrary.

### Prison Rape Elimination Act

86.     Binding PREA regulations, which apply across the BOP, mandate staff reporting, where all BOP staff are required to "report immediately . . . *any knowledge, suspicion, or information* regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

---

[52] *Id*. at 28.

[53] *Id*. at 43.

[54] *Id*.

16

87. When an incarcerated person is subject to a substantial risk of imminent sexual abuse, the BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62.

88. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." 28 C.F.R. § 115.71(a).

89. Further, "[w]here sexual abuse is alleged, the agency shall use investigators who have received special training in sexual abuse investigations." 28 C.F.R. § 115.71(b).

90. The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. 28 C.F.R. § 115.76(b).

91. BOP shall also offer victims medical and mental health care by the BOP. *See* 28 C.F.R. § 115.83.

92. Defendant had countless opportunities to follow those mandates and stop Banks' misconduct. Banks' actions, including, but not limited to, engaging in sexual abuse of Plaintiff were obvious and suspicious for sexual misconduct.

93. Even so, Defendant took no action to investigate or stop this suspicious and recurrent behavior.

94. There is at least one additional survivor of Banks' abuse, though that number is likely higher.

95. Banks sexually assaulted this survivor around the same time that he sexually assaulted Plaintiff.

96. This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

97.     This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face and is the direct and proximate cause for Plaintiff's damages.

## THE BOP ALLOWED OFFICER D. BANKS TO SEXUALLY ABUSE PLAINTIFF AND AT LEAST ONE OTHER PRISONER

98.     In June 2023, Plaintiff was incarcerated at FTC Oklahoma.

99.     Plaintiff worked as a laundry orderly in the laundry unit at FTC Oklahoma.

100.    Banks supervised and oversaw the orderlies who worked in the laundry unit.

101.    Banks brought Plaintiff and her cellmate non-prison food—which was contraband—and told them that they needed to repay him.

102.    On or about June 25, 2023, Banks called Plaintiff into the corrections officers' office, ordered her to remove her clothes, and touched her vulva, and buttocks against her will.

103.    Banks then digitally penetrated Plaintiff's vulva and tried to penetrate her anus against her will.

104.    The following day, on or about June 26, 2023, Banks ordered Plaintiff to undress in the laundry area of the prison and fondled her.

105.    On or about June 26, 2023, Banks took Plaintiff's cellmate to a supply closet where he sexually abused her.

106.    Following the sexual assaults of Plaintiff and her cellmate, Banks repeatedly came to Plaintiff's cell window purporting to bring Plaintiff and her cellmate unnecessary office supplies.

107.    During these visits to Plaintiff's cell window, Banks ordered Plaintiff and her cellmate to undress.

108.    Banks told Plaintiff that this was not the first time that he had done this—underscoring the boldness of Banks' actions and, upon information and belief, Banks' belief that he could sexually abuse inmates with impunity.

109.    Upon information and belief, Banks sexually abused Plaintiff, and her cellmate in areas within FTC Oklahoma where other BOP staff were likely to be.

110.    Given the obviousness and frequency with which Banks sexually abused Plaintiff and her cell mate, and Banks' admission that he had sexually abused prisoners before, other BOP personnel suspected, or should have reasonably suspected, that Banks was sexually abusing prisoners.

111.    Defendant United States and its agents, servants, contractors, and employees had the opportunity to follow those mandates described above and stop Banks' misconduct.

112.    Banks' actions were abnormal, obvious, and—at a minimum—suspicious for sexual misconduct.

113.    In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras.

114.    These officers saw or should have seen that Banks frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer.

115.    Even so, BOP personnel took no action to investigate or stop this suspicious and recurrent behavior.

116.    Upon information and believe, another individual at FTC Oklahoma witnessed Banks' repeated trips to Plaintiff's cell window and reported their suspicion of abuse.

19

117.    In the week following this report, Plaintiff and her cellmate were inexplicably taken to the Special Housing Unit ("SHU") for at least one day.

118.    One week after Plaintiff and her cellmate were taken to the SHU, a BOP Captain told Plaintiff that she was placed there for her safety.

119.    Plaintiff then spoke to Dr. Torres in the mental health unit who reported the sexual abuse to the warden and told Plaintiff that she would get an emergency transfer to another facility.

120.    Defendant and its agents, servants, contractors, and employees had actual and constructive notice that office where Banks sexually assaulted Plaintiff could be used as a site of sexual abuse.

121.    That said, upon information and belief, no BOP personnel came to investigate, intervene, or inquire as to Banks' interactions with Plaintiff or others.

122.    This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

123.    Because of Banks' sexual abuse, Plaintiff has suffered from ongoing trauma, mental torment, and retaliation she suffered, including symptoms such as fear, lack of trust, insomnia, chronic nightmares, anxiety, flashbacks, depression, and Post-Traumatic Stress Disorder.

124.    Because of Banks' sexual abuse, Plaintiff has suffered from severe emotional trauma that will require psychological intervention.

125.    The foregoing are permanent injuries as a direct result of Defendant's deliberate indifference to Plaintiff's health and safety, Defendant's disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendant's negligent failure to promptly protect Plaintiff from foreseeable assaults.

126.    Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

127.    Upon information and belief, Plaintiff will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent, and will continue to severely impact her health, welfare, and daily functioning.

## THE BOP RETALIATED AGAINST PLAINTIFF AND OTHER PRISONERS FOR REPORTING SEXUAL ABUSE BY BOP EMPLOYEES

128.    On or about July 10, 2023, Plaintiff was transferred to FCI Dublin.

129.    Plaintiff worked as a laundry orderly at FCI Dublin but was later fired.

130.    The white male BOP officer told Plaintiff she was being fired from the laundry unit and would have to request a new job "due to the PREA [complaint] that you have."

131.    Plaintiff was unable to start a new job at FCI Dublin before the facility was permanently closed, in part due to the widespread and longstanding pattern of sexual abuse perpetrated by BOP staff against prisoners.

132.    In April 2024, Plaintiff and other prisoners housed at FCI Dublin were transferred by bus to FCI Aliceville, located in Aliceville, Alabama.

133.    On the transfer bus to FCI Aliceville, BOP officers failed to provide Plaintiff and other prisoners with feminine hygiene products and adequate access to restrooms. BOP officers forced the prisoners to sit with trash bags around their waists filled with blood and feces.

134.    On the transfer bus to FCI Aliceville, BOP officers used the bus radio and cooling system to make the transfer unbearably loud and cold for Plaintiff and other prisoners.

135.    BOP officers repeatedly told Plaintiff and other prisoners that the conditions of their transfer were their fault and/or that if they "would have just kept [their] mouth shut" about the

widespread and longstanding sexual abuse at FCI Dublin, the transfer (and its conditions) would not have happened.

## EXHAUSTION

136. Plaintiff has properly complied with 28 U.S.C. § 2675 by presenting and administrative claim against the United States of America.

137. Plaintiff's claim was timely filed within two years of the accrual of the causes of action.

138. Plaintiff sent her administrative claim on February 16, 2024, via certified mail.

139. On March 28, 2025, BOP denied Plaintiff's claim, indicating that the investigation failed to reveal any evidence supporting her claim, and provided six months from this date to initiate a lawsuit.

140. On September 18, 2025, Plaintiff requested that BOP reconsider denial of Plaintiff's claim and provided additional information to support her request for reconsideration.

141. BOP acknowledged receipt of Plaintiff's request for reconsideration and deemed the date of receipt to be September 19, 2025.

142. BOP indicated that Plaintiff should expect a response to her request for reconsideration on or before March 18, 2026.

143. As of the date of the filing of this complaint, Plaintiff has not received a response to her request for reconsideration.

144. Plaintiff has exhausted the requisite administrative remedies.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
### (AGAINST DEFENDANT UNITED STATES OF AMERICA)

145. Plaintiff realleges and incorporates into Count One the allegations set forth above, as if fully set forth herein.

146. At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, undertook and endeavored to, and did provide custodial care to people incarcerated at FTC Oklahoma and FCI Dublin, including, but not limited to, Plaintiff.

147. At all relevant times, Defendant United States had a duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees, including Banks.

148. At all relevant times, Defendant United States acted negligently in its indifference to Plaintiff's safety.

149. At all relevant times, Defendant United States hired correctional and administrative employees at FTC Oklahoma and FCI Dublin, including Banks, as well as colleagues and supervisors of Banks whose identities are currently unknown to Plaintiff.

150. At all relevant times, Defendant United States' employees were acting within the scope of their employment, in their official uniforms during work hours, performing work duties, when exercising custodial care, control, and supervision over Plaintiff.

151. At all relevant times, FTC Oklahoma and FCI Dublin personnel held themselves out to incarcerated individuals as personnel with the ability and knowledge to carry out their duties,

provide due care, and act in accordance with standards of reasonable care common and acceptable in the community.

152.     At all relevant times and within the scope of their employment by Defendant United States, the above-named and unknown staff, while working within their official capacities at FTC Oklahoma and FCI Dublin, owed a duty to Plaintiff while they were at FTC Oklahoma and FCI Dublin, respectively.

153.     It is Defendant United States' duty to maintain, operate, and control FTC Oklahoma and FCI Dublin as safe and secure spaces for persons in it and for persons in transit to and/or from all BOP facilities, including, but not limited to, Plaintiff.

154.     In addition to a custodial duty owed to Plaintiff, Defendant United States of America was statutorily obligated under PREA and BOP policy to protect prisoners from foreseeable harm that included the sexual abuse suffered by Plaintiff.

155.     Defendant United States knew or should have known that Banks had a propensity to sexually abuse inmates.

156.     Defendant United States knew or should have known that Banks acted inappropriately with prisoners under his care at FTC Oklahoma.

157.     Defendant United States was on notice of the possibility that prisoners would be sexually abused by corrections officers and other facility staff, through the above-mentioned investigations, articles, lawsuits, criminal prosecutions, and reports.

158.     As such, there was a foreseeable risk that correctional officers would sexually abuse Plaintiff and others under their control.

159. Agents, servants, contractors, and/or employees of Defendant United States did not exercise reasonable care or take reasonable available measures to abate the risk of sexual abuse to Plaintiff, and to ensure their safety, in violation of federal regulations and BOP protocols.

160. Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

161. Defendant United States knew of or should have known of the risk posed to Plaintiff and other prisoners that they would be sexually assaulted by employees such as Banks.

162. Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility wherein male officers could be alone with female prisoners.

163. Due to Defendant United States' acts and omissions described herein, it breached its duty to protect Plaintiff and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees, including Banks.

164. Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

165. Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

166. Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

167.    Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff is not yet aware.

168.    Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

169.    The failure of FTC Oklahoma personnel to prevent, investigate, or acknowledge Banks' sexual abuse served no legitimate policy purpose.

170.    On the contrary, FTC Oklahoma staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

171.    Plaintiff's injuries were direct and proximate consequences of Defendant United States'

(a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11;

(b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13;

(c) decision to hire, retain, and promote BOP personnel who were suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17;

(d) punishment of victims through disciplinary or retaliatory measures rather than providing proper support and protection, 28 C.F.R. § 115.43;

(e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61;

(f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67;

(g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a); and

(h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

172.    Defendant United States' above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

### COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

173.    Plaintiff realleges and incorporates into Count Two the allegations set forth above, as if fully set forth herein.

174.    Defendant United States' acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Plaintiff severe emotional distress following the sexual abuse that she experienced.

175.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

176.    Plaintiff, in fact, suffered severe and debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

177.    Banks engaged in extreme and outrageous conduct through sexually abusing Plaintiff while she was incarcerated and entirely under the care and control of Defendant United States.

178.     Banks intended to cause Plaintiff severe emotional distress or was recklessly indifferent to the probability of causing such distress when he sexually abused Plaintiff while he was supposed to be providing custodial care.

179.     At all relevant times, Banks was acting within the scope of his employment at FTC Oklahoma and used his authority as a member of the facility's correctional staff to sexually assault Plaintiff, while Plaintiff did not have the ability to consent or withhold consent.

180.     Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Banks.

181.     Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Banks, and his abuse of his position of authority as a correctional officer, within the scope of his employment and under color of federal law.

182.     At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, including Banks, was acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).

183.     At all relevant times, Banks supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned Plaintiff within the scope and course of his employment with Defendant United States. All BOP employees are charged with maintaining security of the institution, and staff's correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

184.     At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Banks, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass,

28

abuse, and assault Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or -shaming, and additional assaults, among others.

185. Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff. The conduct described above constitutes the tort of intentional infliction of emotional distress under the laws of the State of Oklahoma.

186. The conduct described above related to the transportation from FCI Dublin to FCI Aliceville also constitutes the tort of intentional infliction of emotional distress under the laws of the State of California.

187. Thus, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers, including Banks.

188. As a result of FTC Oklahoma personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

189. As a direct and proximate result of Defendant's conduct, Plaintiff suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

## COUNT III – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

190.    Plaintiff realleges and incorporates into Count Three the allegations set forth above, as if fully set forth herein.

191.    Banks committed sexual battery on Plaintiff. It was impossible for Plaintiff to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

192.    Banks acted within the scope of his authority and employment as a federal employee in the administrative unit at FTC Oklahoma.

193.    Plaintiff reasonably believed that Banks was in a position of control or authority, and she did not have the ability to consent or not consent to sexual acts that he initiated.

194.    With the intent to cause harmful or offensive contact, Banks subjected Plaintiff to sexual acts to which she could not consent. These acts were deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

195.    These above-described acts and omissions were a direct and proximate cause of Plaintiff's serious physical and emotional harm.

196.    As a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

197.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

198.     Defendant United States of America is liable for the intentional torts committed by Banks and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT IV – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

199.     Plaintiff realleges and incorporates into Count Four the allegations set forth above, as if fully set forth herein.

200.     Like all employers, Defendant United States had a duty to supervise its employees, including Banks.

201.     Defendant United States hired Banks and other abusive employees and allowed them to use their positions of power within the facility to exert influence over prisoners such as Plaintiff.

202.     Defendant United States knew that potential abusers such as Banks would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

203.     Defendant United States failed to properly oversee and administer FTC Oklahoma and failed to properly implement BOP and PREA policies that would have deterred sexual abuse, such as that suffered by Plaintiff.

204.     Defendant United States had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the reports mentioned above and lawsuits.

205.    Defendant United States' knowledge of prior sexual abuse at BOP facilities, including FTC Oklahoma, placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as Plaintiff.

206.    f Defendant United States had properly supervised employees, facility staff such as Banks would not have the opportunity and/or ability to sexually abuse prisoners.

207.    If Defendant United States of America had properly supervised and investigated employees, such as Banks and his supervisors, it would have learned of his propensity to commit sexual abuse.

208.    Defendant United States' above-described acts and omissions were a direct and proximate cause of Plaintiff's injuries and damages herein.

## COUNT V – BANE ACT / FEDERAL TORT CLAIM ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

209.    Plaintiff realleges and incorporates into Count Five the allegations set forth above, as if fully set forth herein.

210.    Plaintiff was in the custody and control of the United States during all relevant times.

211.    Defendant United States is liable for the intentional torts committed by the unknown FCI Dublin officers, within the scope of their employment and under color of federal law.

212.    In removing Plaintiff from her work assignment explicitly because of her PREA complaint and in mistreating Plaintiff on her transfer out of FCI Dublin, these officers violated her rights to protection from bodily restraint, harm, and insult, as secured by California Civil Code § 43; her rights under the California Constitution to be free of the imposition of punishment without

32

due process, cruel and unusual punishment, and the right to be free from sexual violation; and her right under the Eighth Amendment to the United States Constitution to be free of cruel and unusual punishment, by threat, intimidation, and/or coercion.

213.    As a proximate result of these acts, Plaintiff sustained damage and injury.

**COUNT VI – TRAFFICKING VICTIMS PROTECTION ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

214.    Plaintiff realleges and incorporates into Count Six the allegations set forth above, as if fully set forth herein.

215.    Officer Banks knowingly recruited, enticed, and solicited Plaintiff by offering benefits and things of value, such as not being further retaliated against or experiencing additional physical violence, for engaging in sex acts, and made Plaintiff engage in sex acts through force and coercion.

216.    Observing BOP employes knew of, or should have reasonably known, that Banks was soliciting Plaintiff in exchange for sex acts, and benefited by failing to protect Plaintiff.

217.    This conduct caused Plaintiff serious harm, including without limitation, physical, psychological, emotional, financial, and reputational harm, and she has a claim for damages for such violations under 18 U.S.C. §§ 1591 and 1595.

**COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

218.    Plaintiff realleges and incorporates into Count Seven the allegations set forth above, as if fully set forth herein.

219.    Defendant United States' acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused Plaintiff severe emotional distress following the retaliation that she experienced.

220.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or was recklessly indifferent to the probability of causing, Plaintiff severe emotional distress.

221.    Plaintiff, in fact, suffered severe and debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

222.    Unknown FCI Dublin officers engaged in extreme and outrageous conduct through retaliating against Plaintiff through one or more of the following ways while she was incarcerated and entirely under the care and control of Defendant United States:

a.   Firing Plaintiff from the laundry unit at FCI Dublin.

b.   Forcing Plaintiff and other prisoners to travel from FCI Dublin to FCI Aliceville without access to feminine hygiene products and adequate access to restrooms.

c.   Forcing Plaintiff, and other prisoners, to travel from FCI Dublin to FCI Aliceville with trash bags around their waists filled with blood and feces.

d.   Using the bus radio and cooling system to make the transfer between FCI Dublin and FCI Aliceville unbearably loud and cold for Plaintiff and other prisoners.

e.   Telling Plaintiff and other prisoners that the conditions of their transfer were their fault and/or that if they "would have just kept [their] mouth shut" about the widespread and longstanding sexual abuse at FCI Dublin, the transfer (and its conditions) would not have happened.

34

223.    The conduct of unknown FCI Dublin officers was unprivileged.

224.    Unknown FCI Dublin officers intended to cause Plaintiff severe emotional distress or were recklessly indifferent to the probability of causing such distress when they retaliated against Plaintiff as described above while they were supposed to be providing custodial care.

225.    At all relevant times, unknown FCI Dublin officers were acting within the scope of their employment at FCI Dublin and used their authority as members of the facility's correctional staff to retaliate against Plaintiff as described above.

226.    Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress and gender violence) perpetrated by unknown FCI Dublin officers.

227.    Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by unknown FCI Dublin officers, and their abuse of their position of authority as correctional officers, within the scope of their employment and under color of federal law.

228.    At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees, including unknown FCI Dublin officers, were acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h).

229.    At all relevant times, unknown FCI Dublin officers supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned Plaintiff within the scope and course of their employment with Defendant United States. All BOP employees are charged with maintaining security of the institution, and staff's correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

230.    At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including unknown FCI Dublin officers, used their

authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, and abuse Plaintiff and to prevent her from disclosing the retaliation for fear of further retaliation, victim-blaming or -shaming, and additional assaults, among others.

231.    Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff. The conduct described above constitutes the tort of intentional infliction of emotional distress under the laws of the State of California.

232.    Thus, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers, including unknown FCI Dublin officers.

233.    As a result of FCI Dublin personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiff suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

234.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered serious harm, including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment against the Defendant as follows:

(a) An award of compensatory, punitive, and nominal damages to Plaintiff in an amount to be determined at trial;

(b) An award to Plaintiff of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

(c) For such other and further relief as this Court may deem just and proper.

Dated: March 19, 2026

Respectfully submitted by,

EmilyRose Johns, SBN 294319
Siegel, Yee, Brunner & Mehta
475 14th Street, Suite 500
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698
Email: emilyrose@siegelyee.com